I appreciate the patience this court has shown. It's me, a lawyer, this is my first time before the Ninth Circuit. Well, I'll give you a small tip also. A couple of things. One, when you get a notice to appear from the clerk at a certain time, then I would urge you, whether here or in the Tenth Circuit or elsewhere, to appear on time. That also gives you an opportunity to observe in any individual court how the procedures work in terms of timing and that sort of thing. And I think you'll be more comfortable and not as nervous if you have a chance to sit back and kind of see what the other lawyers are doing. So get here early. All right? All right. I appreciate your consideration. All right. You may proceed. Ms. Gerhardt, I need to – I'm sure you're aware that there have been motions from the Army here in terms of to strike part of your record here. Now, obviously, a fundamental part of appellate advocacy is this court can only consider what was before the district court. And they have alleged that you've included certain things that – and certainly most recently – first, they said generally there were things in there. Most recently, they filed a motion that went to specific areas of the EEOC that you had included that was not before the district court. Have you looked at that? I received the most recent supplemental motion to strike, I believe, on Tuesday. And I've looked at that, and I filed a response, which I filed overnight, which was scheduled to arrive today, and I checked with the clerk's office. They weren't sure if it had arrived. It was scheduled to arrive. Well, we don't have it. So now my reading of the record is that the EEOC that you included was not part of the record in front of the district court. So how are we supposed to consider that here, and why aren't they appropriately asking to have that stricken? Well, to be quite frank with you, there was some confusion on my part as to exactly what was part of the district court's record and what wasn't. And I dealt with the litigation division, Department of the Army in Washington, D.C., regarding what was and was not part of the record and tried to come to some kind of an agreement and understanding on what was made a part of the record and was never really able to do that. And so I apologize for including parts of the record and thought I had come to some kind of an agreement. However, there was a succession of attorneys assigned to this case. All right, but do you agree that we can't consider something that was not part of the record? Well, in this case, I don't agree with that because I feel that Rule 30 does allow this court to consider, particularly in this case, because we have an EEOC hearing transcript of three volumes upon which Judge Caruth very clearly relies in part, in great part actually, on Judge O'Toole's opinions. In that case, if there is something beyond the record and you think that we could take judicial notice or otherwise, then the procedure would be to ask us to do that. Otherwise, our pretty clear rule on the federal level is that if it's not in the district court, we're not going to look at it because we don't benchmark or make any fact findings here. All right. And is it also the position at this point that it is too late to do that? I'm not going to tell you one way or the other. The motion is pending to strike. You've made a response, and we will take a look at that. Okay. Well, then I would be glad to look at the case from the viewpoint of the Applease brief and to take it from there because, for the most part, their motion to strike the statement of facts and the portions of the record that I have included in the appendices are we'll take that aside and we'll assume that those portions are stricken for purposes of argument and look at it from the perspective of the Appalese brief. And for that, we look at the citations that they include. And I think even in looking at their statement of the case as well as the statement of facts, I still believe that there were material issues of disputed fact that Judge Peruth decided improperly in this particular case. And I think that's also established from the face of his particular opinion. For example, it's my understanding in this circuit that issues of fact, which are stated in an opinion for a motion for summary judgment, the clearly erroneous standard applies. And there were several points at which Judge Peruth stated facts in his opinion which are not supported in the record that appeared at least to be before the district court, such as the plaintiff, Carol Zaspera, agreed that she had never gone to anyone in the spring of 1993, either Emily Fagan or Laverne Jenkins, complaining or showing concern regarding the opening of that position, the position of a medical technologist which was a permanent position. And the material fact here would be Laverne Jenkins, one, was in the EEO office for the Army. And just the fact that she was an EEO specialist in the plaintiff in this case, Carol Zaspera went to that office. Obviously, you don't go to that office just to shoot the breeze. I mean, you go to the office to allege a complaint, which Ms. Zaspera did and said very clearly that she did. And then Ms. Zaspera went to Ms. Fagan, who was in the CPO office, and also issued a concern and an issue. And those are a matter of the record that was before the court, that was before Judge Peruth. And Judge Peruth did address those and deal with those. And those concerns were expressed by the plaintiff in this case. And after the posting of that particular announcement, I believe on January the 13th, 1993, and even in February of 1993. And in fact, Laverne Jenkins, who produced an affidavit, I believe in October of 1996, before she actually testified in the EEOC hearing, in which I believe her affidavit was a part of the district record below, the district court record. That affidavit even admits that she spoke with Carol Zaspera, also spoke to Thompson regarding Zaspera's concerns. Now, it is true that at this point, Ms. Jenkins at that point said, oh, well, no, she never expressed any concerns regarding discrimination. And yet, once again, I would have to say there's an inference there that Carol Zaspera is going to the EEO office, she's going to the CPO office concerned about the opening and the fact that she's not going to be considered. So I consider that a material issue of fact. Well, what about on your, let me focus you on the untimeliness. Yes. That the district court did not find that Ms. Zaspera's claim was untimely because she did not contact EEO officers initially within a specified timeframe, but because she did not file a civil action within 90 days after her right to sue notice. I don't see any evidence other than that she got a right to sue notice and she didn't file a civil action. So why is that not untimely? If I had been the Army, what I would have done the moment she filed a civil suit is I would have filed a motion to dismiss that it was out of time. That she had alleged this complaint of supposedly in the early spring of the. . . But assuming that they didn't have to, the court, that if it's untimely, it's untimely, why is the district court wrong on that? The district court, in my opinion, would be wrong on that because the filing of the 90-day right to sue letter, let's assume if the plaintiff had filed timely within that 90-day period. This was a 1995 letter, correct? Yes, but you have to be timely within the period from 1993. You have to do it within that 45-day period and it has to be processed. First of all, the EEO office of the Army refused to accept her complaint and still today professes there was no evidence that anything like that was ever alleged or filed. And Mr. Henderson of the EEO office refused to file it and still today, as I understand it, alleges that she never came to him and talked to him about it. I'm still a little confused. She didn't file her complaint within 90 days, correct? No, she did not, and that was based on the 1993 opening. Right. So is there any do you have any case law or authority that would say the district court was wrong on that? The most that I can offer you at this point is an equitable estoppel argument based on fraudulent concealment, as I've argued in the brief. But what's concealed once the EEOC gives you your right to sue? You've got the 90 days. But at that point, we have no idea what the EEO office of the Army has in terms of that complaint or evidence related to it. No, but you don't need to win your case when you file your complaint. All you need to do is make, with attorney's signature or client affidavit, allegations that meet general pleading standards of just as you stand up here and say here was the problem, here is how they discriminated against her. So I'm not sure how what the Army or any of the other people did have anything to do with her ability to file a complaint that would pass minimum pleading standards. Well, at that point, she wasn't represented by an attorney. Not before the 90 days began, not during the 90 days, and not after the 90 days expired. So you had a pro se plaintiff. She had no evidence at that point. So when did she have an attorney? I do not believe that she had an attorney. Let's see, this was 95, because March 7th was when I believe they issued the 90-day letter. So that was sometime in early June that the 90 days expired. I do not believe that she got an attorney until the fall of 1995. But then she didn't file a lawsuit until 1999. No, because by then the two EEOC complaints, they'd been bifurcated. One was the discriminatory hiring, which had been issued, the 90-day letter had been issued on the discriminatory hiring from the 93 opening that she wasn't considered for. Let's just assume for a moment that we look at something in terms of she didn't have a lawyer, she didn't understand something in the 90 days. Well, she still has a lawyer in 1995, and so there's not a lawsuit filed until 1999. But she's outside the 90 days at that point, and she gets an attorney for the second charge, which is being pursued by the EEOC, and that's the discriminatory discharge and the retaliation. Why don't you move then to the discriminatory termination? But I understand your point. Yes. Move then to that second claim, discriminatory termination, looking at who got hired and who didn't get hired, and then what the statements made by the Army as to why those employee or personnel decisions were made. What, in your view, establishes a prima facie case on her behalf? Well, I think that the Army, at least in its brief, agrees that she has established a prima facie case with the exception of one element, and that is the similarly situated element, you know, that she's in a protected. So I think it's the element of similarly situated that we're really disagreeing on. And in that case, I believe that the Army is relying on what you would call a conclusory black letter law, and that is that to be similarly situated, you have to have the same supervisor. You have to be similar in all material aspects. I would say that that is not the case here, because in the Vasquez case, for example, which is the subject of their January 12th letter, the case that they cite to you, in that case we have a plaintiff, Mr. Vasquez, who is accused of some workplace violation and is subsequently terminated. And the issue there is he's not similarly situated to this female employee. In our case, we have Carol Zastera, who is placed by the Army, by the employee or, into a group who has a Sterling record, into a group of 12 temporary employees, all of whom are slated for job elimination, because they're contemplating a RIF. But they don't have a RIF. They do not. But in February of 93, that's the contemplation. And so there are these 11 employees who are going to be RIFed. And they are all in the hospital context, and they're all going to be RIFed, and they're all subject to the same standardized evaluations, policies, and procedures. And so to that extent, and by the way, I do have a case that just came down in December in this circuit, Strike, which I have the subject of a letter that I had hoped to file today, and I didn't yet. But Strike was a case in this circuit from December of 2003, and it says when you look at similarly situated, you look at work history and company policies. All right. What was the cause of Zastera's termination? It's my understanding the cause of her termination was, and they said up to the time of her termination was that her job was eliminated due to a reduction in force. Well, now, didn't Granger make the decision to grant Germans early retirement? And wasn't that decision what was the cause of her termination? Yes, but you see, there was no RIF. And the only reason that she was RIFed was because of Germans termination. No, but she wasn't RIFed. Exactly. That's the point. She was not RIFed. They said when she was terminated, she was RIFed. But you see, that was not why she was terminated, because there was no RIF. Now, RIF is a very specific. It is. It has a very specific meaning. It does, and that didn't happen in this case. So I think I'm going to have to take exception with your saying that she was RIFed. The Army says that. That's what the Army said on September the 24th when she was discharged, that she was RIFed. And that Mazie German retired, and because Mazie German retired and Carol Zastero was the temporary who took or was behind Mazie German, that's the reason Zastero was discharged, because of a RIF, which never took place. Now, isn't that, no, isn't that that when someone's granted an early retirement, then it abolishes their position, and then so there no longer was a position for her? Is that correct? At that point, yes. But you see, the other 10 who were in that group, all of them were given positions or a chance at positions, and none of them were in Carol Zastero's protected category. So there's where your similarly situated comes in. I'm telling you that she was similarly situated to these other 10, and she was treated differently. None of them complained to the EEO's office. None of them complained to Emily Fagan before their RIFing. Only they all had a chance at another job, and they were all given other jobs. Did you want to save some time for rebuttal? I do. I'm sorry. Thanks, guys. Thank you. Thank you. May it please the Court, my name is Bruce Ferg. I'm an Assistant United States Attorney appearing on behalf of actually I guess now the Secretary of the Army is Mr. Brownlee. So there's been that transition in the titles. To try and respond to the questions and the issues that have come up so far and kind of keep on track with what's been asked, the single claim of a material fact or a material issue yet before this Court, which Appellant's Counsel was able to offer, was that Judge Caruth, the magistrate judge, had misstated or misunderstood what had happened with regard to Ms. Zastra's going to the CPO and EEO people. However, if you read excerpt of Record 658, which is the page where that part of his decision appears and specifically note 20, he makes the point, and this is borne out by the testimony both before the ALJ, that although she went to those people, she expressly was simply apparently discussing her concerns and the testimony was expressly that she did not claim at that point that there was any discrimination that was being in effect. So whether she went there simply because those were friends or people that she thought were sympathetic or might be able to influence the process, it was simply her concern at that point that Captain, later Major Thompson, was not going to open the position for what were called OPM people as opposed to local. And there was no allegation, and this is a specific finding of fact both by Judge Caruth and by the ALJ, that discrimination was ever put into issue at that point. So yes, she went to those people, but there's nothing in the record that I'm aware of that can be specifically pointed to which says that she went there to complain that she was being discriminated against. Now, secondly, we come to the issue of the timeliness of her first claim. And as far as I can tell, it is essentially undisputed that she did not file until four and a half years after the EEOC decision came down, very clearly telling her, we are bifurcating this, we are upholding this part of it, the first claim, and we're sending this part back to the Army, and telling her you have 90 days. Now, she's indicated that she's not represented by counsel. That may be technically true, but in the EEOC proceedings, she had been represented by a union representative, obviously someone very knowledgeable about what was going on. And in any event, whether she was represented or not, it was there in black and white in the letter to her saying, you have 90 days to sue about this part of your claim. And so the fact that she happened not to have technical legal counsel at that point really is irrelevant. She was on notice that that's what she was supposed to do, and she did not do it. Well, there isn't anything in the record that indicates she didn't receive the letter. No. Or that she didn't understand it or anything along those lines. And I don't think it's ever been claimed that she did not. Because it was never made an issue, that is, again, material that's not technically in the record that went before Judge Carruth, but there are, in fact, documents from the EEOC following her decision addressed to the same address where she's always been. Well, on that record, I've been struggling with this record here in terms of because it seems to me that there are things that appellant is trying to put in the record that were not in the record before the district court, which I think clearly this court cannot consider. But then there are also things that are not in the record that were before the district court, it seems to me. Like, for example, Defendants Exhibit 18, which was the testimony of Ms. Callaway. Defendants Exhibit 19, a letter from Dr. Keene to Dr. Kratz regarding the Kapp and Thompson's performance. Plaintiffs Exhibit AA, vacancy announcement for a position in May of 1984. There seems to be things that were in front of the district court that aren't here, and there are things that appellant is trying to put in that weren't in front of the district court. I think that that's probably true. I'm afraid I can't help you much with the second part of your question because when I was told that Mr. Claus would not be able to argue this and it was given to me, I basically tried to update or clarify what had been requested in his original motion. Well, let me ask you in terms of she, a counsel for appellant, seemed to make the argument to me that there was some way that the court, this court, could look at EEOC records that were not before the district court. Are you, do you have any authority for the court for that proposition? I think the rule is exactly the opposite. The whole point of the rules and how they define the record and the excerpts of record is that you only get to look at what was in fact before the district court. Now, your first motion obviously was pretty general. Your last motion was more specific as to certain things of the EEOC record. Well, the original motion was in a sense easier because at that point, what Ms. Astor's counsel had done was simply dump the entire EEOC transcript on Moss into the record in three connected volumes. And so the motion simply said, please throw out those three volumes. You've obviously looked at what she's tried to get in the record. Yes, ma'am. Looking at that, is there anything that you see in that record that you feel would support a different finding than what the district court? Honestly, I do not. I think basically that the government's defenses, if you will, or the reasons why we believe that the motion of summary judgment was properly granted would prevail even in the face of the other stuff that was in there. But again, that's with a caveat that I was focusing on what I believed to be properly before the court, and I didn't try and get ready to rebut all the stuff that I didn't think was properly before you. Would you clarify something on the RIF? I guess it was a proposed RIF that never actually took place. Since it never actually occurred, could you explain how that worked in terms of the voluntary or the termination of these temporary employees in that same application category and then the subsequent termination of this individual? I think that there is information in our supplemental excerpts of record which is very helpful, particularly the affidavit of Jim Carano, who was formerly a colonel, and the attachments thereto, and also the excerpt of testimony of Colonel Granger. And basically what they explain was that the Fort Huachuca Hospital received information from its higher command that they were going to sustain substantial funding reductions for the following fiscal year. And so in order to meet that problem, they went into essentially a preparation for a RIF. What page is that affidavit on? It's the very first one in the SCR. In the supplemental? Yes, sir. Page what? Well, one. Page one. Of the supplemental excerpts of record, our excerpts. All right. Thank you. And it's explained there, as well as in the testimony of Colonel Granger, which begins on page 11 of the supplemental excerpts, that in order to deal with this impending budget cut, they went through what they would for a RIF. And the first thing that they did was look at the entire hospital, not just the lab, but the entire hospital, and decided that all of the temporary slots would be abolished. And this would give them a certain amount of savings. And there is a memorandum there from Colonel Serrano to their higher, the commander of the hospital, explaining how they intended to do this. As a result of that, a number of people, including Ms. German in the lab, came forward and said, if there's going to be a RIF, this is a good time for me to leave. And so as a permanent employee, she was allowed to take this voluntary early retirement, vera. But as explained then in the testimony of Gina Ryan, which begins at page 25 of the supplemental excerpts, she's the personnel specialist, what happens when a permanent position in a certain series is allowed to exit under vera, that means that all of the temporaries in that same series must necessarily go as well. And that's what happened to Ms. Astra. Because Ms. German was going to go as a result of all of this impending RIF activity, hers was going to go too. But the main point is that none of this was engineered or decided by Captain Thompson, the only one who's alleged to have discriminated. It was by this council of higher ranking officers who were saying, we have to confront this management situation of an impending RIF. As a result of the various temporaries who were laid off and other things they were able to do, they actually managed to have considerable savings. And so a formal RIF in the sense that a permanent employee was forcibly sent out the door didn't happen. They managed to avoid that. But at the same time, there were substantial budget reductions and number of slots, primarily the temporaries of which Ms. Astra was one, were reduced. Now as far, and I'm kind of getting ahead of myself, but as far as this whole similarly situated issue, what we find is that she was not similarly situated with anyone else. She is quite different in that, first of all, she was in a technical position, whereas all the others were clerical. And that is a significant factor because the point was made in Colonel Granger's testimony, as I cited you to, by Colonel Haynes, the hospital commander, that the clerical people, because of their direct impact on the quality of patient care to the extent it was possible, he wanted to salvage those slots. And so that's why those people ended up in some instances, not all, being made permanent. They were able to shift the slots and so forth. But they were involved in the direct administration of patient care. Secondly, we actually have nothing in the record that tells us. Well, now one of the people, Gloria Montenegro, was a medical transcriptionist. So that's not really, isn't it correct that six of the seven temporary employees that obtained permanent positions were clerical and then the other was a medical transcriptionist? Yes. Who worked in a different department and supervised by different individuals? Exactly. And that's the other major point about this similarity issue, is that none of those other people were, in fact, supervised by Captain Thompson. And so whatever his motivations may have been, everything that is happening is on a hospital-wide basis. So Thompson or Granger didn't have any say in what happened to the other temporary employees? Colonel Granger was part of the committee. I think they called it the Quality Control Committee or something like that, and their memo is what's attached to Colonel Serrano's affidavit, which was a group that suggested the across-the-board cutting of the temporary slots. But there is no indication that Colonel Granger was aware that at approximately the same time, Ms. Zastra had gone to the EO or CPO offices about an entirely different issue. Now, my understanding, when Zastra was terminated, there may have been three vacancies on the books for permanent technologists, but none of those vacant positions were ever recruited or filled. Is that correct, or am I wrong on that? I honestly am not sure about whether there were vacancies. I'm saying maybe. I mean, looking at it most favorably. Thompson divided Zastra's duties among the remaining employees under his supervision. Is that correct? That's correct. There were military people who were circulating through as well as the civilians, and so he basically distributed all of the things that she had been doing as a substitute for the prior lady. And at this point, after her position was abolished, it could only come back in, or it had to be formally reestablished and justified, and that could not happen for at least six months. And by that time, the lab had acquired these two Beckman analyzers, these multitasking machines, which allowed them basically to accomplish much more efficiently what they had been doing before. And so the testimony was that by that point, somewhat to his surprise, Captain Thompson found that he was able to get by without all of the people that he had before, and so he simply did not attempt to reestablish the position that had been riffed or abolished, however we want to call it. Now say that's – was it a riffed or an abolished position? Well, it's basically a semantic issue, and this is, again, it's in Judge Carew's findings, and he reflects what the ALJ found. Well, does it make a difference whether it was a riff or abolished pursuant to her retirement? I would submit not, because basically what happened was that none of it was engineered or was influenced at all by Captain Thompson, so there's no causal connection between his alleged discriminatory intent and what happened to her. It all happened as a result of the fact that when Ms. German went out the door, the regulations required that all of the other positions in that series be abolished, and so her going out the door apparently was connected with the fact there was this impending riff. But that was her decision. It was an objective, neutral regulation that said all of these positions have to go, and as a matter of fact, it turned out that she was actually treated better than was originally expected in that she was allowed to stay through the end of her one-year contract period to September of 1993 rather than actually having to leave in July as had originally been anticipated. They were told, well, at their temps, you can keep them until the end of their appointments. And so this also is important because what we're talking about is notices. A temporary person who had a specific period of employment eligibility, and she's basically arguing that the government was then required to create a position for her or to continue to employ her when she had no legitimate expectation that that would happen, at least none that's legally cognizable. She was a temporary person told your period runs through September of 1993, and that's basically what she got. She would have liked to have had more. Initially, they would have liked to have given her more. Captain Thompson was quite upset when Lieutenant Colonel Granger told him that as a result of her Vera request, Ms. German was going out the door, and so one of his main people was going, and he actually said, how am I going to run my shop? And that's when the whole upgrading with the Beckman analyzers and that process came in. So to summarize, we have essentially two claims in front of you, two, if you will, substantive claims. The first one is simply out the door. It's gone because it was never pursued in the way that it should have been pursued. Four and a half years after a letter, which has never been disputed, that she received, she finally gets around to suing. And one says 90 days in black and white and English. So that one's simply gone, and there's no legal or factual basis for disputing that. Secondly, we have the so-called discrimination in termination, which actually more accurately is simply a non-retention or a non-extension of her temporary status, where there is not only no similar situation to other people demonstrated, but most importantly, no causal connection. All of the decisions that resulted in her not having a job were not by Captain Thompson. They were by the Quality Control Council and by the neutral regulations and by ultimately the fact that he passively found that there was no need to reestablish the job, but there's no right to have a job reestablished. And finally, as far as the kind of discrimination that's been suggested that underlies this, she's shown absolutely nothing beyond a mere coincidence of timing. Basically, as I said, Captain Thompson was not under duty to wait around until she became eligible through going through the OPM certification process to apply for the position in the first place. And as a matter of fact, again, the decision to let all the temporaries go was not his. And so there's no proof that any of those higher authorities, any of those lieutenant colonels and colonels who decided how to manage the proposed RIF, knew anything at all about what the disaster was doing. So there is that fundamental breakdown, which, again, Judge Kruth alluded to, no indication at all of any discriminatory attitudes or actions by the actual decision makers, these higher people up at chain of command. Thank you. The end of Ms. Zastero's term was September the 29th, 1993, and she was terminated or her job eliminated on September the 24th, 1993. RIF equals Vera equals the job elimination by Carol Zastero. It does make a difference. It was a RIF. That's what the Army called it, and that's why she was terminated. Secondly, on the issue of retaliation, she not only filed a complaint with the EEO office, and the EEO office is the Army. It's not a separate division. Not only in the spring of 1993, but also September of 1993, that paperwork was not found in the EEO office until February of 1995, at which time it was filed, and that's the reason the EEOC issued a letter of a right to sue letter in March of 1995. There are some very what are called fishy facts in this case, and if you look at similarly situated in reverse discrimination cases, you will see that helper, if they had let's just say that they hadn't lost it, accepting what you said, well, it certainly would seem unfair if they expected her to file within 90 days of 1993, but they didn't do that. They went over to 95. So the right to sue, you know, let's assume what you're saying is correct and that they lost it and there were delays that are their fault. How does that relieve her of having to file her lawsuit within 90 days of when she got the letter, which is not disputed in the record? I understand that. And the most I can say, and being quite frank and honest with you, is at that point she's got a pretty stale claim. There's no discovery. There's no evidence. There are no issues. But that didn't stop her. It got more stale in 1999. I understand, and I will not dispute that issue with you. Okay. And I'm not going to spend a lot of time in rebuttal on that issue. Okay. I won't. Thank you. The other issue that I would like to bring up is on the first claim, one of the things Judge Kruth did say when he said, sorry, the first claim is dead. I'm ruling against you on that. You can use the facts regarding that attempt to file in early 1993 in your discriminatory termination claim and the retaliation claim. You're not precluded from doing that. I don't disagree with you on that. Yeah. So that still does apply. Also, I still have some confusion on exactly what was in the record below and what wasn't, and I did try to deal with, at police counsel, on that. I apologize to the court for confusing you on that issue and will certainly defer and vow to your decision. Well, it's fairly serious to, as counsel, to make representations that something's, you know, to ask the court to look at things that weren't in the record. And, I mean, those are the type of things that parties rightly come before the court and ask the court to sanction people for in terms of. And so you have to be incredibly careful about things. It also, I was a little bit confused at times as to what Judge Kruth had before him in some of the things he was looking at. So I do apologize to you. The case, I think your time has expired. Yes. The case of Zestera v. Caldera is submitted. I will just say this, Ms. Gerard, in terms of, as you know from the 90-day rule with respect to your client, that certainly in federal court procedures often make and break our cases one way or the other. And so it's important to go look at the district court record. It's important, if you have a court order, to show up on time, to be here on time. It's important under Rule 28J of our appellate rules and our record rules that you follow those. I appreciate your efforts to respond to the court, but, you know, we don't have your FedEx because it's not going to arrive until after this argument. We don't have your 28J letter because it wasn't sent. So we spend a lot of time in advance of these arguments preparing, and I just suggest to you for the future that you look carefully at the rules because there's a reason for the rules that helps not only the court but helps the client. So I trust that you will take that into account as you move forward. Thank you.
judges: Wallace, McKeown, Callahan